# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| LATASHA BREITENSTEIN | : | |
| Plaintiff, | : | |
| | | Case No. 3:10cv00032 |
| vs. | : | |
| | | District Judge Walter Herbert Rice |
| MICHAEL J. ASTRUE, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social | | |
| Security Administration, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.    Introduction

Plaintiff Latasha Breitenstein left high school before graduating and has attempted without success to hold a job.  She is married and has two children.  She has cognitive difficulties, a speech impairment, depression, anxiety, and a history of childhood abuse.  In 2002 she sought financial assistance from the Social Security Administration by applying for Supplemental Security Income (SSI).  Her application was denied upon initial review and she did not appeal.

In May 2004 Plaintiff filed another SSI application.  After initial administrative denials, her application and supporting materials proceeded to consideration by

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Administrative Law Judge (ALJ) Thomas R. McNichols II.   After a hearing, during which Plaintiff testified, ALJ McNichols issued a written decision concluding that Plaintiff was not under a "disability" within the meaning of the Social Security Act.  (Tr. 16-30).  He consequently concluded that Plaintiff was not eligible to receive SSI.  (Tr. 16-30).

The ALJ's nondisability determination and resulting denial of Plaintiff's SSI application ultimately became the final decision of the Social Security Administration. Plaintiff brings the present case through counsel seeking judicial review of ALJ McNichols' decision.  The Court has subject matter jurisdiction.  *See* 42 U.S.C. §405(g).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record, and the record as a whole.  Plaintiff seeks an Order reversing the ALJ's decision and granting her SSI.  Or, at a minimum, Plaintiff seeks a remand for additional proceedings.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.   Evidence In The Administrative Record

### A.    Plaintiff's Vocational Profile and Intellectual Functioning

Plaintiff was 26 years old at the time of the ALJ's decision; she was thus considered to be a "younger person" for purposes of resolving her SSI application.  *See* 20 C.F.R. §416.963(c); *see also* Tr. 30, 61.  Plaintiff has attempted to work for brief periods:  McDonald's, Burger King, and Meijer in 1998; a beer company, McDonald's,

2

and Taco Bell in 1999; and McDonald's in 2000.  (Tr. 56-57).

Because she did not complete the eleventh grade in high school, she is considered to have a limited education, at most, under Social Security Regulations.  *See* 20 C.F.R. §416.964(b)(3); *see also* Tr. 30, 77-102, 110.  Although the administrative record does not contain a full picture of her academic background, the evidence shows that she attended special education classes due cognitive difficulties and stuttering.  For example, records from her individualized education program for her final year in school, the 1999-2000 school year, state that she would receive "Special Educational services 6/7 of the day."  (Tr. 86).  She was exempted from certain exams because "[t]he curriculum used as the instructional basis for [her] program [was] significantly altered from the general educational curriculum."  (Tr. 90).

In the fall of 1997, when Plaintiff was age 17, a school psychologist assessed her academic level and administered a Stanford Binet Intelligence Scale:  Fourth Edition. (Tr. 96).  Plaintiff scored 64 on verbal reasoning, 64 on quantitative reasoning, 74 on the abstract/visual reasoning scale, and 72 in short-term memory.  *Id.*  Her composite IQ score was 62.  The report documenting those tests states, "This IQ score is classified within the mildly retarded range.  Latasha's Verbal Reasoning skills fell in the mildly retarded range.  These skills tend to be very closely related to most school related tasks. Abstract/Visual Reasoning skills fell in the slow learner range." (Tr. 96).  The report continued, "Nonverbal Reasoning/Visualization, taps the child's immediate problem solving ability (tasks are nonverbal and presented visually).  Latasha's nonverbal ability

3

and fluid intelligence falls in the mildly retarded range...."  (Tr. 96).

Plaintiff's results on the Woodcock-Johnson Tests of Achievement-Revised showed her basic reading skills at grade 3.8.  (Tr. 94).  The test report noted, "[her] standard score for Basic Reading Recognition ... suggests that compared with other adolescents her age, performance was considerably below average...."  (Tr. 94).  Her reading comprehension score equaled grade 8.3 and indicated a "relative strength" and an average performance.  (Tr. 94).  Her math abilities ranged from the 2nd- to 5th-grade level. Her "general ability to perform 'pencil and paper math' calculations was considerably below average."  (Tr. 94).   Plaintiff's written expression equaled grade 3.0, again "considerably below average."  (Tr. 94).

Additional testing in the Fall of 1997 – again, when Plaintiff was age 17 – showed her visual-motor skills at age 7 years 0 months.  (Tr. 98).  On the Vineland Adaptive Behavior Scale, Plaintiff scored in the low range in communication and socialization, and she scored in the moderately-low range in daily-living skills.  (Tr. 99).  Part of a report addressing Plaintiff's "Communication Status" notes that her "teacher reports that Latasha is a stutterer.  Many times there is a delay from what she's thinking to her being able to speak.  She knows what she wants to say, but nothing comes out.  Other times her speech is fluent...."  *Id*.  Her total adaptive behavior composite was also in the low range, or the 0.3 percentile for her chronological age group.

**B.**     **Dr. Martin  – November 2002**

4

Plaintiff was evaluated by Thomas O. Martin, Ph.D., a clinical psychologist, on behalf of the Ohio Bureau of Disability Determinations in November 2002.  (Tr. 168-73). Plaintiff reported to Dr. Martin that she had been "diagnosed at 4 years of age as having a bipolar disorder and schizophrenia."  (Tr. 168).  But Dr. Martin noted that "such diagnoses would not be made for a child at that age."  *Id*.  Dr. Martin further noted that Plaintiff "was unable to say why she was unable to work."  *Id*.

Plaintiff informed Dr. Martin that she had "worked at 4 fast-food jobs," had quit her last job in 2000 after four months, and "had never been fired from a job."  (Tr. 169). Dr. Martin observed that Plaintiff's "affective responses were bland."  *Id*.  "She cooperated with the assessment, although her mood was mildly dysphoric, sympathy-seeking suspicious of others' motives and actions toward her, and interpersonally withdrawn."  *Id*.  Dr. Martin noted, "her speech was clear and coherent, without pressure, acceleration, or an articulation impediment."  *Id*.

Plaintiff took care of her own personal hygiene, cooked and shopped with her husband, did the housework, and washed the laundry.  (Tr. 170).  She indicated she was easily irritated with minor disruptions in her routines and had verbally snapped at others with little provocation.  *Id*.  Plaintiff noted that her husband was exclusively responsible for paying the family's bills.  *Id*.

Dr. Martin wrote that Plaintiff "attempted to depict herself as intellectually 'challenged' and to have substantial memory impairments, as well as reading-comprehension difficulties, in order to have the appearance of being in some way

5

'disabled.'  Her judgment was self-centered, impulsive, and short-sighted, and she failed to display self-understanding about her emotions, cognitions, or about her patterns of behavior." (Tr. 170).

Results of tests Dr. Martin administered showed Plaintiff's reading comprehension at grade 6.5.  (Tr. 171).  IQ test results revealed Plaintiff with a verbal IQ of 73, performance IQ or 67, full- scale IQ of 67.  Dr. Martin wrote, "When compared with scores of similar-aged adults, [Plaintiff's] Verbal IQ score suggested functioning within the Borderline range of measured-intelligence, while both the Performance and Full-Scale IQ scores suggested functioning within the 'Extremely Low' (i.e., formerly known as 'mild mental retardation') range."  (Tr. 171).  Dr. Martin thought that Plaintiff's verbal IQ score was valid but he thought that her performance and full-scale IQ scores were "underestimates of [her] 'true' level of measured-intellectual performance (believed to actually fall within the Borderline range, with WAIS-III scores from 70 to 79)."  *Id.*  He explained that Plaintiff "made little effort to accurately and timely complete the non-verbal portions of the WAIS-III."  *Id.*

Dr. Martin administered a Wechsler Memory Index (WMS) – III, but felt the results were underestimates of Plaintiff's memory skills. *Id.*

Dr. Martin diagnosed Plaintiff with borderline intellectual functioning and borderline personality disorder.  (Tr. 172).  He found that Plaintiff's mental abilities to relate to others; understand, remember, and follow instructions; maintain attention, concentration, persistence, and pace in simple, repetitive tasks; and withstand work stress

6

were not impaired "despite her intellectual functioning within the borderline range." (Tr.

172). Dr. Martin assessed Plaintiff's Global Assessment of Functioning[2] at 70, "which

corresponds to '[s]ome mild symptoms [of mental illness] OR some difficulty in social,

occupational, or school functioning, ... but generally functioning pretty well, has some

meaningful interpersonal relationships.'" *Ladwig v. Commissioner of Social Sec*. 39

Fed.Appx. 971, 975 (6th Cir. 2002) (citation omitted).

## C.    Dr. Tischler – December 2002

Carl Tischler, Ph.D. reviewed the record for the Ohio Bureau of Disability

Determinations in December 2002. (Tr. 174-90). Dr. Tishler completed a psychiatric

review technique form. (Tr. 175-86). In doing so he checked a box under the heading

"12.05 Mental Retardation" and noted "BIF," apparently indicating his opinion that

Plaintiff had "Borderline Intellectual Functioning." (Tr. 179). He also checked a box

indicating that Plaintiff had borderline personality disorder and box opining that Plaintiff

had moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 182,

185). Although the form repeatedly provided space for explanation, Dr. Tischler

provided none. *See* Tr. 175-187.

Dr. Tischler also completed a form addressing Plaintiff's mental residual

---

[2]   Health care clinicians perform a Global Assessment of Functioning to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Hash v. Commissioner of Social Sec*., 309 Fed.Appx. 981, 988 n.1 (6th Cir. 2009); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34.

functional capacity.  (Tr. 187-90).  He wrote that Plaintiff personality disorder does not reduce her mental residual functional capacity.  (Tr. 189).  He further wrote that she "actively takes care of her household & children."  *Id*.  And he thought that Plaintiff might have difficulty sustaining detailed or complex tasks.  *Id*.

### D.    Dr. Higgins – 2004

Between April and June 2004 Andy Higgins, Ph.D., completed a psychological report, evaluating Plaintiff for Montgomery County Children's Services.  (Tr. 191-205).  The evaluation was performed, Dr. Higgins, reported, "within the context of considerable intra-family conflict...."  (Tr. 191).  At that time, Plaintiff was age twenty three and was living with her husband, her two sons (ages one and three), and a step son. (Tr. 191, 193).

Dr. Higgins administered the Wechsler Abbreviated Scale of Intelligence (WASI). The results were consistent with borderline intellectual functioning.  (Tr. 200, 203).  Dr. Higgins estimated that if he administered the full WAIS-III test, Plaintiff would obtain an IQ "within the borderline range in 95 of 100 administrations."  *Id.*

Dr. Higgins opined:

> She is functioning considerably below average intellectually, but would be considered from an intellectual standpoint as a functional adult.  She is capable of learning new skills, including parenting skills.  An instructional approach that favors small discrete learning units with hands-on learning experiences and frequent review and repetition would be most conducive to learning.

(Tr. 203).

Dr. Higgins observed that Plaintiff "stutters and has a low speech volume.  She is

cognitively slow.  Thought processes are concrete." (Tr. 196).  He thought that her

"memory is consistent with borderline intellectual functioning.  She was able to answer

six out of nine general information questions.  She was able to do a simple single addition

problem in her head and was able to do a simple subtraction problem using her fingers

and it took considerable time.  She was unable to do a simple multiplication and division

problem in her head.  She was unable to interpret the saying, "Don't count your chickens

before they're hatched.'" (Tr. 197).

At times during the evaluation Plaintiff used paper to write down answers to

questions.  However, Dr. Higgins noted that after rapport was established and he

remained patient, Plaintiff was able to communicate more effectively without writing

words or answers.  (Tr. 193).  Plaintiff reported that she had been attending GED classes

four days a week for approximately 6 to 8 months.  (Tr. 194).  She reported quitting her

"only job" at McDonald's because she was taking care of her son.  (Tr. 195).  She

reported taking care of her personal hygiene, cleaning the house, caring for her kids,

helping with cooking and shopping, and doing dishes and laundry.  (Tr. 197).  "She

"reports that her hobbies are taking care of her kids." *Id.*

Dr. Higgins noted that Plaintiff and her husband "both do the cleaning ... both do

the grocery shopping, cooking and paying the bills." *Id*.

On August 3, 2004, Plaintiff was assessed at Eastway Behavioral Healthcare.  (Tr.

228-37).  She reported having "depression since childhood and anxiety with increasing

panic attacks when feeling stressed by baby crying, GED class work or when shopping."

9

(Tr. 228).  She had support from her father, husband, and a female friend.  (Tr. 229, 231).

She would go to the park with her children, go out to eat, and go to movies.  *Id.*  The

counselor noted Plaintiff's depression, anxiety, and severe stuttering, and assessed her

with borderline intellectual functioning.  (Tr. 236).  She received psychiatric treatment at

Eastway between August 2004 and December 2004.  (Tr. 222-27).

### E.  Dr. Jones – August 2004

Clinical psychologist Mary Ann Jones, Ph.D. evaluated Plaintiff in August 2004

for the Ohio Bureau of Disability Determinations.  (Tr. 206-19).

Dr. Jones administered a WAIS-III test, finding a verbal IQ of 72, a performance

IQ of 72, and a full scale IQ of 69.  (Tr. 212).  She opined that Plaintiff's WAIS-III

results were "thought to be somewhat of an underestimate of her intellectual ability, and it

is likely she is more accurately functioning in the borderline range."  (Tr. 208).

Addressing "Conversation and Thought,"  Dr. Jones wrote, "Ms. Breitenstein's

speech was clear and 98% understandable.  Her conversation proved relevant, but only

semi-coherent.  She does have a serious stuttering problem that interfered with her

communication.  Stream of thought proved appropriate to retarded, and thought

association proved primarily concrete." (Tr. 207).

Dr. Jones explained in summary:

Ms. Latasha Breitenstein presents as a young woman who is experiencing
symptoms consonant with the diagnosis of Major Depression Recurrent,
Posttraumatic Stress Disorder, and Stuttering.  She also presents as quite
anxious.  She withdraws from others and indicates that she is unable to get

10

along with others because she feels they are judging her and because of her low self-esteem.  She indicates she feels sad much of the time, and cries for no reason.... She indicates a relatively inactive lifestyle, and she tries to attend General Educational Equivalency Diploma classes so she can receive food stamps for her family.  She notes that she experiences easy anxiety in the presence of others, especially with people with whom she is acquainted. She resides with her husband and children.  Her husband takes care of all of the external household business and pays the bills.  Ms. Breitenstein presents with marginal information, judgment and reasoning to live independently, to make important decisions concerning her future, and to manage her own funds.

On psychological testing, Ms. Breitenstein was found to be functioning in the borderline-mentally retarded range of intelligence.  Here memory skills also fell between the mentally retarded to the borderline.  She was found to be functionally illiterate.

(Tr. 209-10).

Dr. Jones diagnosed Plaintiff with major depression recurrent, post-traumatic stress disorder, developmental reading disorder, stuttering, and borderline intellectual functioning.  (Tr. 210).  She assessed Plaintiff's Global Assessment of Functioning at 52, indicating "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV-TR at p. 34.

Dr. Jones opined that Plaintiff would have moderate difficulties understanding, remembering, and following instructions due to "her borderline intelligence and poor memory skills." (Tr. 210).  Dr. Jones thought that Plaintiff's ability to relate to others, including workers and supervisors was moderately impaired by her stuttering difficulties, depression, and anxiety.  Dr. Jones also thought that Plaintiff would be able to perform

simple, routine tasks as she did at home.  *Id.*  And Dr. Jones opined that the combination

of "borderline intellectual functioning" and other impairments would moderately impair

some of Plaintiff's her work abilities.  (Tr. 211).

### F.    Dr. Semmelman – October 2004

Psychologist Patricia Semmelman, Ph.D., evaluated the evidence for the Ohio

Bureau of Disability Determinations in October 2004.  She completed both a psychiatric

review technique form and a mental residual functional capacity form.  (Tr. 240-56).  In

the latter, she provided a lengthy written explanation of her assessment.  She wrote in

part:

> She can sustain concentration and attention for repetitive routine tasks.  The
> claimant has a history of being in speech therapy for a significant stutter.
> She reports it basically had decreased significantly until the recent
> involvement with Children's Services.  She was not to stutter more at the
> beginning of each evaluation that at the end as she became more relaxed.
> She was described as semi-coherent at the CE [consultative exam], but this
> was not the case at the first evaluation.  The claimant presented herself
> rather differently at each of the exams.  She denied nearly all psychiatric
> symptoms when evaluated for Children's Services.  There were no
> flashbacks or any other symptom of PTSD.  No crying spells or temper.
> She reported that she was anxious in groups.  She came across as mildly
> depressed and anxious....  At the CE she reported depression, anxiety, that
> at times she cries for no reason in class.  She reported at the C[E] she gets
> so depressed that she does not get out of bed at times, but again no
> indication of this in 4-04.  She visits with others at times.  She reports she
> relates well with her husband... There is nothing in the file which shows
> any event that would have worsened her condition in the four months
> between the two evaluations.  She may have presented herself somewhat
> better at the first and somewhat worse at the second, but given that her
> social skills appear to be no worse than moderately impaired.  At the first
> evaluation, her stutter was severe first to the point where she began writing
> things down, but as noted once rapport was establish she was able to

communicate more effectively without writing words or answers.  And both evaluation [sic] found that they were able to understand what she was trying to convey once  she felt more comfortable in the setting.  Her stutter would impact her ability to do work in a highly social and/or public setting.  She can interact occasionally and superficially and receive oral instructions and ask questions appropriately in a work setting.  She can cope with ordinary and routine changes in a work setting that is not fast paced or of high demand.  Allegations are partially credible.  Due to the inconsistencies no one source is given controlling weight.

(Tr. 255-56).

### G.    Other Evidence

In October 2005 Plaintiff was assessed at Samaritan Behavioral Health for anxiety and depression arising from a conflict with her mother over custody of her children.  (Tr. 265-74).  She reported that she had six friends, was "good at sports, keeping the house clean, and taking care of the kids."  (Tr. 266).  She indicated that she would take her sons to the park, do family activities, and care for her sons.  She attended church twice a week and felt that it helped her.  She was tearful.  She felt guilty and hopeless about things getting better.  And she was having difficulty concentrating and it took longer to do chores.

Plaintiff further reported that she was having panic attacks when in large groups of people.  (Tr. 268).  The counselor noted, in part, "excessive stuttering, good eye contact," poor hygiene, she appeared "more anxious than depressed," and "borderline intellectual functioning."  (Tr. 269).  Initial diagnoses included panic disorder with agoraphobia, major depressive disorder, a personality disorder, stuttering, personality disorder, and

13

borderline intellectual functioning. (Tr. 273). Her Global Assessment of Functioning was 50, indicating "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision (DSM-IV-TR) at p. 34

Plaintiff attended two counseling sessions in October and November 2005. (Tr. 261, 263). She showed improvement but missed her other appointments due to a lack of transportation and was discharged from counseling as a result. (Tr. 257-58).

A few months later, in March 2006, Plaintiff was assessed at Day-Mont Behavioral Healthcare. (Tr. 312-23). The social worker noted that Plaintiff had sought treatment to "better cope with stressful situations." (Tr. 312). She was still taking classes for her GED. The social worker observed that Plaintiff "stutters and has difficulty communication verbally." *Id*.

The social worker's impression was bipolar disorder with a lack of social and personal skills. (Tr. 321). She assessed Plaintiff's Global Assessment of Functioning at 65, *id*., indicating "[s]ome mild symptoms ... or moderate difficulty in social, occupational, or school functioning ... but generally functioning pretty well...." DSM-IV-TR at p. 34.

Plaintiff attended additional sessions with a social worker and a psychiatrist. (Tr. 302-11). The psychiatrist diagnosed bipolar disorder, stuttering, and a "history of [a] learning disorder." (Tr. 306-07).

In June 2006 the social worker observed that Plaintiff had "no problem caring for

her children, including [her] stepson." (Tr. 301). Plaintiff reported making progress by August 2006 with no problems eating, sleeping, or caring for her children, and she felt more energetic and less depressed. (Tr. 300). The psychiatrist noted continued progress in September and October 2006. (Tr. 296-99).

### H.    **Plaintiff's Testimony**

Plaintiff testified during the ALJ's hearing in February 2007. She stated she was married and had two sons – ages four and five. (Tr. 330-31). She did not have a driver's license, although she had tried to get one but did not pass the test. (Tr. 331-32). She acknowledged that she went to school through the tenth grade and had not obtained a GED. (Tr. 332). She had never received any vocational training. (Tr. 333).

Plaintiff explained that she had last worked at McDonald's, but she had to quit because of her problem with stuttering. (Tr. 334). She further explained that she had experienced stuttering all her life. *Id*. Speech therapy she had received in school did not help. (Tr. 334-35).

Plaintiff reported that she received counseling for depression, anxiety, and a bipolar disorder. (Tr. 335). She indicated that counseling helped her "a tiny bit." *Id*.

During the hearing, the ALJ asked, "And one point did the welfare authorities take your children away from you?" (Tr. 336). She answered, "Yes sir." (Tr. 336). By the time of the ALJ's hearing, her children had returned and had been living with her for more than one year. (Tr. 326, 336).

15

Plaintiff testified that she could not work because she cannot be around "a whole bunch of people." (Tr. 336). She stated that she had four friends. (Tr. 337). She saw her family doctor as needed. (Tr. 334, 337).

Plaintiff reported that she cooked sometimes – only "easy stuff" – and she washed dishes, vacuumed, swept, mopped, and did laundry. (Tr. 338-39, 343). She stated that she would get up in the morning and get her sons ready for school. She would watch TV, eat lunch, and fix her children a snack after school. (Tr. 340-41). Plaintiff's husband did the shopping, including grocery shopping. (Tr. 339). She had problems counting money and had never had a bank account. (Tr. 342). She explained, "There's days I have crying and I can't do it because I have crying spells." (Tr. 344). Her dad helps out once or twice a week. (Tr. 344-45).

## III.    The "Disability" Requirement and Administrative Review

### A.    Applicable Standards

The Social Security Administration provides SSI to indigent individuals, subject to several eligibility requirements. Chief among these is the requirement an SSI applicant must be a "disabled individual." 42 U.S.C. §1381a; *see Bowen v. City of New York*, 476 U.S. 467, 470 (1986). The phrase "disabled individual" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. 42 U.S.C. §1382c(a)(3)(A);

*see Bowen*, 476 U.S. at 469-70. An SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992).

**B.**    **The ALJ's Decision**

To determine whether Plaintiff was under an SSI-qualifying disability, ALJ McNichols considered the evidence under Steps 1 through 5 of the sequential evaluation procedure required by Social Security Regulations.  *See* Tr. 16-30; *see also* 20 C.F.R. §416.920(a)(4).  His significant findings, for present purposes, began at Step 2 where he determined, "The medical evidence establishes that the claimant has "severe" impairments of: borderline intellectual functioning with reading disorder, stuttering, and depression/anxiety.  Those impairments may affect her ability to perform some basic work-related functions."  (Tr. 29).

At Step 3 the ALJ concluded, "The severity of the claimant's impairments, however, does not meet or equal the level of severity described in Appendix I, Subpart P, Regulations No.4. [the Listings]."  (Tr. 29).

Next, at Step 4, the ALJ assessed Plaintiff's residual functional capacity as follows:

> Plaintiff has the residual functional capacity to perform the basic exertional requirements of work at any level of exertion, as such work is defined for Social Security purposes, if she is: (1) restricted from climbing ropes, ladders, and scaffolds and from work near hazards; (2) restricted from work involving contact with the general public; (3) restricted from work involving complex or detailed instructions; (4) restricted from work requiring reading above a 6th-grade level; (5) limited to low stress jobs (no

17

fixed production quotas); (6) not required to maintain concentration on a single task for longer than 15 minutes at a time; and (7) limited to simple, one- or two-step tasks.  There is no evidence of any other impairment which reduces the claimant's functional capacity to any greater extent than described in this residual functional capacity.

(Tr. 29).

With these findings in mind, and in light of Plaintiff's age, education, and work experience, the ALJ found that Plaintiff could perform certain medium, light, and sedentary jobs existing in the regional and national economies.  (Tr. 30).  This led the ALJ to ultimately conclude that Plaintiff was not under a SSI-qualifying disability and was not, therefore, eligible to receive SSI.

**IV.**  <u>**Judicial Review**</u>

Judicial review of the ALJ's decision determines " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007).

The review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as

adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

If the ALJ did not apply the correct legal criteria, his decision might contain reversible error even if substantial evidence supports his factual findings.  *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    Discussion

### A.    The Parties' Main Contentions

Plaintiff asserts that she is under a disability because she meets or equals the criteria for mental retardation in Listing 12.05C.  She argues that the ALJ failed to discuss the validity of her IQ scores, which were within the required levels set by Listing 12.05C, and the ALJ instead improperly relied on the diagnosis of borderline intellectual functioning by three reviewing psychologists.  Plaintiff argues, in this manner, the ALJ "conflates his analysis."  (Doc. #8 at 58).  Plaintiff further asserts that she has other

impairments that imposed additional and significant limitations on Plaintiff's ability to work.

The Commissioner argues that substantial evidence supports the ALJ's determination that Plaintiff did not meet or equal the criteria for mental retardation in Listing 12.05C.

## B.    Listing 12.05C and the ALJ's Decision

Plaintiff's Step-3 arguments are potentially dispositive because an adult whose impairments meet or equal the criteria of a Listing is presumed be under a disability and is granted benefits without further evaluation.  *See Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see also Combs v. Comm'r. of Social Security*, 459 F.3d 640, 649 (6th Cir. 2006)(en banc).

Listing 12.05 describes the criteria necessary to establish a disability based on mental retardation.  Its first sentence provides:

> Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

20 C.F.R. Subpart P, Appendix.  The ALJ's decision that Plaintiff did not meet or equal Listing 12.05C is at issue in this case.

Section 12.05C's required Plaintiff to establish that she had a "valid verbal,

performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Subpart P, Appendix.

In addition, a "claimant will meet the listing for mental retardation only '[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria.'" *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)(quoting in part, Listing 12.00(A) *as amended by* Revised Criteria for Evaluating Mental Disorders...., 65 Fed. Reg. 50746, 50776, 2000 WL 1173632 (Aug. 21, 2000)(brackets and italics in *Foster*).

The ALJ explained his conclusion that Plaintiff did not meet or equal Listing 12.05C as follows:

> The claimant's borderline intellectual functioning does not meet the severity of Listing 12.05C. Dr. Martin and Dr. Jones both arrived at diagnoses of borderline intellectual functioning rather than retardation. They both felt that the claimant's borderline range performance on verbal I.Q. sub-testing, and on general memory testing, represented her true intellectual status. Dr. Martin noted that the claimant made very little effort in testing. The three BDD [Bureau of Disability Determinations] psychologists who reviewed the evidence concurred in the diagnosis of BIF [borderline intellectual functioning] rather than mental retardation.
>
> In addition, the claimant lacks the behavioral correlates of mental retardation. Her past work record included training as a cashier and in a vocational cosmetology program. She tested in high school with an 8th grade reading comprehension level and with a mid 6th grade comprehension level when she was tested by Dr. Martin in 2002. The claimant had no apparent mental difficulty with routine household tasks, child care, or using public transportation. She reported that she purchased money orders to pay her bills. The claimant attended weekly Bible study meetings and was taking GED prep classes. In sum, the claimant's overall

21

adaptive behavioral functioning is not consistent with a condition of mental retardation.

(Tr. 23-24).

C.    **Analysis**

**1.**
**IQ Test Scores**

While some of Plaintiff's IQ scores – specifically her verbal and performance IQ scores – fell within the borderline range of intellectual functioning, her composite IQ score of 62 when she was still in school – classified at that time as "within the mildly mentally retarded range."  (Tr. 96).  This IQ score of 62 was likewise well within Listing 12.05C(1)'s range (60 through 70).  In addition, two of her later full scale IQ scores fell within the range of Listing 12.05C.  At age twenty-two she scored a full-scale IQ 67; at age twenty-three, she scored a full-scale IQ of 69).

Social Security Regulations allow a Plaintiff to use the lowest IQ score on a given test (verbal, performance, or full-scale) to satisfy Listing 12.05C(1).  The Listings promise, "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQ's are provided in the Wechsler series, we use the *lowest* of those in conjunction with 12.05."  Listing §12.00(D)(6)(c), Appendix 1 to Subpart P, Part 404 (emphasis added).

In rejecting Plaintiff's verbal IQ scores, the ALJ relied on Dr. Martin's notes, which indicated that Plaintiff "made little effort to accurately and timely complete the

22

non-verbal portions of the WAIS-III." (Tr. 19)(citing Tr. 171).  The ALJ further relied on

Dr. Jones' statement wherein she opined that Plaintiff's IQ test results were "somewhat of

an underestimate of her intellectual ability," and that Plaintiff likely was "more accurately

functioning in the borderline range." (Tr. 23)(citing Tr. 208).  This constituted error

because the ALJ selected only the evidence that supported his non-Listing determination

and overlooked evidence – Plaintiff's IQ test results in school – that satisfied Listing

12.05C(1).  *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must consider all

the record evidence and cannot 'pick and choose' only the evidence that supports his

position."); *see also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v.

Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).  Plaintiff's IQ test scores while in

school deserved discussion by the ALJ because the school records contain no hint that

Plaintiff's IQ scores were invalid or less than reliable.  Instead, the records tend to

confirm the opposite.  For example, the October 1997 testing report states: " Latasha was

observed during testing.  Although she remained on task and persisted with the stimulus

materials, she seemed hesitant at times in offering a response.  In general she was related

and gave good effort to the task." (Tr. 93).  And it was those tests that resulted in

Plaintiff's composite score of 62, which, again, was "classified within the mildly mentally

retarded range." (Tr. 96).  Similarly, Plaintiff's verbal reasoning score of 64 "fell in the

mildly retarded range." *Id*.  The ALJ erred by ignoring or overlooking this evidence

without explanation. *Cf. Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000)("ALJ must

consider all the record evidence and cannot 'pick and choose' only the evidence that

23

supports his position."); *cf. also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984);

*Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002).

The Commissioner points out that the ALJ properly relied on all three doctors who

performed psychological evaluations of Plaintiff—Dr. Martin, Dr. Higgins, and Dr. Jones

– each of whom declined to diagnose her with any form of mental retardation.  In

addition, the Commissioner argues that all three of the state agency reviewers concurred

with the assessment of borderline intellectual functioning.  And the Commissioner

maintains, as did the ALJ, that record lacks a mental retardation diagnosis or diagnostic

corroboration in the record.  *See* Tr. 23.

Both the Commissioner and the ALJ find a need for a diagnosis of mental

retardation that is not present in Listing 12.05.  Indeed, the Commissioner is usually quick

to point out – and is correct as a matter of law to do so – that a mere diagnosis does not

establish that a claimant is under a "disability."  *See, e.g., Landsaw v. Secretary of Health

and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986); *see also* 20 C.F.R.

§416.927(e)(1); *cf. Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)("The mere

diagnosis of arthritis, of course, says nothing about the severity of the condition."); *King

v. Barnhart*, 2007 WL 968746 at *5 (S.D. Ind. 2007)("The Commissioner cites to *Foster

v. Halter* ... to argue that a claimant must meet a formal diagnosis of mental retardation.

*Foster* did not say that....").  Requiring such a diagnosis in cases of mental retardation

would place formalism over substantive evidence, especially where the plain language of

Listing 12.05C does not specifically require a claimant to produce evidence from a

medical source diagnosing mental retardation.  Thus, instead of requiring evidence of a diagnosis of mental retardation, the correct analysis focuses on whether the evidence of record meets or equals Listing 12.05's introductory paragraph and Listing 12.05C's criteria.  *See Foster* 279 F.3d at 354; *see also King*, 2007 WL 968746 at *5.

Plaintiff correctly observes that neither Dr. Martin nor Dr. Jones had access to her school records and test results.  Consequently, the ALJ's reliance on their reports did not include, by implication, consideration of Plaintiff's cognitive test results during school.  Although the ALJ mentioned the school scores when summarizing the record, *see* Tr. 18, he did not mention those scores in evaluating whether Plaintiff met Listing 12.05C.  In this situation, and given Plaintiff's multiple IQ test scores, the Regulations allow her to rely on her lowest IQ test scores reported by the school psychologist to meet Listing 12.05C(1), rather than forcing her to accept the diagnoses of borderline intellectual functioning.

For the above reasons, Plaintiff's challenges to the ALJ's  conclusion that her IQ test scores did not satisfy Listing 12.05C are well taken.

### 2.
### Other Impairments

Listing 12.05C(2) required Plaintiff to show she has a physical or other mental impairment that imposes an additional and significant work-related limitation of function.  The ALJ's decision itself acknowledges the existence of such limitations.  The ALJ found that in addition to Plaintiff's cognitive difficulties, her severe

impairments included stuttering as well as depression and anxiety. (Tr. 25, 29). These findings under the Regulations to demonstrate that Plaintiff satisfies Listing 12.05(C)'s requirement of an "additional and significant work-related limitation of function." The Regulations explain, "For paragraph [12.05]C, we will assess the degree of functional limitation the additional impairment(s) imposes if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, a 'severe' impairment(s), as defined in ... 416.920(c)." Listing 12.00A, Appendix 1 to Subpart P, Part 404.

In other words, the ALJ's determination at Step 2 that Plaintiff's stuttering, depression, and anxiety were "severe" impairments under 20 C.F.R. 416.920(c), he had effectively determined that these impairments imposed "additional and significant work-related limitation of function" in satisfaction of Listing 12.05C. *See* 12.00A. To find otherwise, as the ALJ did, created an internal conflict between his conclusion at Step 2 – that Plaintiff's stuttering and depression/anxiety impairments significantly limited her work ability, *see* Tr. 23 – with his conclusion at Step 3 – that Plaintiff did not have an additional and significant work limitation of function, *see* Tr. 23-24. *See* Listing 12.00A.

Accordingly, the ALJ's recognition of the limitations imposed by Plaintiff's stuttering, depression, and anxiety meet the requirements of Listing 12.05C(2).

### 3.
### Adaptive Functioning

The Commissioner contends that substantial evidence supports the ALJ's conclusion that Plaintiff also did not exhibit the required deficits in adaptive

functioning".[3]  This contention lacks merit.

In assessing Plaintiff for special education under the Individuals with Disabilities Education Act, the evaluation team reported when Plaintiff was age 17 in 1997 that: "Measure of ability in the below average range.  Deficits in adaptive behavior.  The adaptive behavior measure indicated skills in communication and socialization in the low range, and daily living skills in the moderately low range.  Deficits in reading, math and written language.  Deficits in adaptive behavior and academic achievement are consistent with her overall ability level.  Reported delay in meeting developmental milestones in language."  (Tr. 101).

In addition, Dr. Jones' report documents significant deficits in Plaintiff's functional academic skills.  She noted that Plaintiff's reading comprehension level "equivalent to the end 1st grade level and this level is considered functionally illiterate." (Tr. 209).  According to Dr. Jones, Plaintiff would be unable to read a daily journal or fill out a simple job application.  *Id.*  This was consistent with testing during Plaintiff's achievements during her adolescent years and demonstrates Plaintiff's deficits in adaptive functioning consistent over the longitudinal record.  Similarly, the Woodcock-Johnson Tests of Achievement, when Plaintiff was age 17, showed Plaintiff's basic reading skills were at a 3.8 grade equivalent, that her ability to read and spell was below a third-grade

---

[3] "Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."  DSM IV  at p. 42.  Mental retardation requires concurrent deficits or impairments in present adaptive functioning in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  *Id.* at 49.

level and her arithmetic skills were only at the fourth-grade level.  (Tr. 180).

Dr. Jones also noted significant deficits in appearance ("made a generally Plain-Jane appearance.  Facial expressions proved anxious to dull"); work ("She notes, "I can't keep a job because of my stuttering.""); leisure activities ("her quality of life can be character as inactive and routine."); and social/interpersonal skills ("Anxiety: She had a severe stutter and significant secondary movements associated with the stutter, as well.  There were no other overt signs of nervous tension.  She admits that she experiences unusual fears and panic symptoms when she feels others are watching her.  She also notes that she occasionally has flashbacks with regard to her mother's abuse, Consequently, she avoids being in large groups, whenever possible.  She admits to becoming easily upset and anxious.").  (Tr. 206-08).  The ALJ never mentioned this aspect of Dr. Jones' report but instead relied on the fact that she worked at a fast food restaurant and stated she left because she did not like the work, and to take care of her child.  (Tr. 24).  The ALJ also noted that Plaintiff attended GED classes and was able to tolerate contact with others in that setting.  *Id.*  She also rode the bus and did some shopping.  *Id.*

The evidence in the administrative, particularly but not limited to Dr. Jones's report, showed adaptive abilities/deficiencies similar to those in *Brown v. Secretary of Health and Human Services*, 948 F.2d 268 (6th Cir. 1991).  In *Brown*, the United States Court of Appeals for the Sixth Circuit found that the plaintiff's (Mr. Brown's), IQ score of 68 was valid and that his abilities were within the DSM-III-R's diagnosis of mild mental retardation corresponding to an IQ between 50-55 and 70, pursuant to the DSM-

III-R.[4]  *Brown*, 948 F.2d at 269-70.  The Court of Appeals explained: "Mr. Brown is able to use public transit; he has a driver's license; he visits friends; he is able to make change at the grocery store; he can do his own laundry and clean his room; he has completed the sixth grade; he has a limited level of reading comprehension (Mr. Brown stated that he can follow a road atlas, and a friend testified she had seen him read a newspaper); and as a truck driver, Mr. Brown recorded mileage, the hours he worked, and the places he drove." *Brown*, 948 F.2d at 269-70.  Like Mr. Brown's abilities, Plaintiff's accomplishment in attending GED classes, riding public transportation and shopping along with her prior work experience are not inconsistent with a finding of mild mental retardation.  *See id.*  The record, moreover, reveals that Plaintiff has never worked on more than a part-time basis, *see* Tr. 28, 147, and there is no evidence in the administrative record that she has ever lived on her own.

In addition, the Court of Appeals in *Brown* recognized that individuals with mild mental retardation, as defined by DSM-III-R, have abilities similar to those possessed by Mr. Brown.  And, again, such abilities are similar to Plaintiff's.  The Court of Appeals explained that individuals with mild mental retardation, "[b]y their late teens ... can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the

---

[4] <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 3rd ed., Revised.

present time, *virtually all people with Mild Mental Retardation can live successfully in the community, independently* or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible)." *Brown*, 948 F.2d at 270 (quoting DSM-III-R §317.00).  Consequently, the ALJ's reliance on Plaintiff's purported ability to live independently fails to support his conclusion that she lacked deficits in adaptive functioning before age 22.

For all the above reasons, Plaintiff's Statement of Errors is well taken.

## VI.   <u>Judicial Award of Benefits</u>

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

An Order remanding for payment of benefits is only warranted "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176.

A judicial award of benefits is warranted in the present case because the evidence overwhelmingly shows that Plaintiff meets or equals Listing 12.05's introductory paragraph and the criteria of Listing 12.05(C), or the evidence satisfying Listing 12.05's introductory paragraph and the criteria of Listing 12.05(C) is strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

Accordingly, Plaintiff is entitled to an Order remanding this matter for payment of SSI.

## IT IS THEREFORE RECOMMENDED THAT:

1.  The Commissioner's non-disability finding be vacated;

2.  Plaintiff's case be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. §405(g) for payment of SSI consistent with the Social Security Act; and

3.  The case be terminated on the docket of this Court.


January 6, 2011                                    ___s/Sharon L. Ovington___
                                                        Sharon L. Ovington
                                                  United States Magistrate Judge

31

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).

32